IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| TRANSVERSE, LLC § | |
| § | |
| v. § | A-13-CV-101 SS |
| § | |
| INFO DIRECTIONS, INC., d/b/a IDI § | |
| BILLING SOLUTIONS § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO: THE HONORABLE SAM SPARKS
UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and, alternatively, Motion to Transfer Venue (Dkt. # 5); Plaintiff's Response, (Dkt. # 12); Defendant's Reply Brief (Dkt. # 15); and the Parties' post-hearing briefs (Dkt. # 22 & 23).[1]

The undersigned magistrate judge submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I. GENERAL BACKGROUND**

Plaintiff Transverse, L.L.C. ("Transverse") is a software company that develops billing software for telecommunications companies. It has its principal place of business in Austin, Texas. Defendant Info Directions, Inc., d/b/a IDI Billing Solutions ("IDI") is also a software developer of billing software and has its principal place of business in Victor, New York. In early 2009, Transverse and IDI competed for a contract to develop a new customer care and billing system for

---

[1]On April 22, 2013, the Court denied Transverse's request for jurisdictional discovery. See Dkt. # 16.

Iowa Wireless Services, LLC ("IWS"), a telecommunications consortium that provides wireless telecommunication services to the public. IWS ultimately awarded the contract to Transverse and on June 18, 2009, Transverse and IWS entered into a "Contract for the Supply of: blee(p) Customer Care and Billing System" (the "blee(p) Contract"). See Exhibit A-1 to Plaintiff's Response. IWS and Transverse also entered into a Mutual Non-Disclosure Agreement ("NDA") dated March 3, 2009, under which IWS agreed to maintain the confidentiality of, and not disclose to third parties, Transverse's confidential, proprietary information.

Transverse alleges that in February 2010, IDI engaged in communications with IWS in an attempt to interfere with Transverse's business relationship with IWS and replace Transverse as the supplier of the billing system software. Transverse further contends that IDI requested and was provided access to Transverse's confidential and proprietary trade secret information related to the blee(p) Contract. Transverse contends that IDI's wrongful acquisition of Transverse's confidential and proprietary information gave IDI an improper advantage to develop a billing system for IWS. Transverse further alleges that "(o)nce IDI was armed with Transverse's trade secrets and had gotten up to speed on the project, IWS subsequently wrongfully declared Transverse in default and terminated the blee(p) Contract with Transverse." Plaintiff's Complaint at ¶14. Shortly thereafter, IWS replaced Transverse with IDI as the new supplier of its billing system software.

On July 9, 2010, Transverse filed a lawsuit against *IWS*. See *Transverse, LLC v. Iowa Wireless Services, LLC*, 1:10-CV-517 LY. In the lawsuit against IWS, Transverse alleged breach of contract, quantum meruit, negligent misrepresentation, misappropriation of trade secrets/violation of Texas

Theft Liability Act and conversion. After a jury trial on the breach of contract claim,[2] the jury returned a verdict in favor of Transverse and awarded it $9.3 million in damages for lost value and $10 million for lost profits. *See* Verdict (Dkt. # 267 in A-10-CV-517 LY). Post-Judgment motions are currently pending before U.S. District Judge Lee Yeakel.

On February 6, 2013, Transverse filed the instant lawsuit, this time against IDI, alleging (1) trade secret misappropriation, (2) violation of the Texas Theft Liability Act, (3) conversion, (4) unfair competition by misappropriation, (5) unjust enrichment/constructive trust; and (6) tortious interference with an existing contract. On March 22, 2013, IDI filed a Motion to Dismiss for Lack of Personal Jurisdiction, and, in the alternative, Motion to Transfer Venue, arguing that IDI does not have sufficient minimum contacts with Texas for the District Court to exercise general or specific jurisdiction over it.[3] On April 10, 2013, Judge Sparks referred the Motion to Dismiss to the undersigned. See Dkt. No. 14. After denying the request for jurisdictional discovery, the undersigned held an evidentiary hearing on the motion on May 1, 2013, and also permitted the parties to file post-hearing briefs. Having considered all of the parties' evidence and submissions, the Court submits the following Report and Recommendation.

---

[2]Transverse's claims of trade secret misappropriation, conversion and breach of the non-disclosure agreement were not submitted to the jury and Judge Yeakel has taken them under advisement. See Dkt. # 273 and # 274.

[3]In the IWS lawsuit, IWS also moved to dismiss or, alternatively, to transfer the case for improper venue. However, in the IWS lawsuit, IWS argued that the case should be dismissed or, transferred to Iowa, not because of lack of personal jurisdiction but because of a forum selection clause contained in the parties' contract. See IWS's Motion to Dismiss (Dkt. # 6). Adopting former Magistrate Judge Robert Pitman's recommendation, Judge Yeakel denied the motion to dismiss, finding that the forum selection clause contained in the contract was permissive, rather than mandatory. See Dkt. # 23. Because the decision in that case was based on the forum selection clause contained in the parties' contract in the IWS lawsuit, something that is not present here, the decision in the *IWS* case does not have any bearing on the motion to dismiss in this case.

## II.  GENERAL PRINCIPLES

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the state's long-arm statute permits an exercise of jurisdiction over that defendant, and (2) an exercise of jurisdiction would comport with the requirements of the Due Process Clause of the Fourteenth Amendment.  *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009), *cert. denied*, 131 S.Ct. 68 (2010);  *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003), *cert. denied*, 540 U.S. 1111 (2004).  Because the requirements of Texas's long-arm statute are coextensive with the requirements of the Due Process Clause, the sole inquiry is whether the district court's exercise of personal jurisdiction over the defendants would be consistent with due process.  *Id.*

"The Due Process Clause of the Fourteenth Amendment protects a corporation, as it does an individual, against being made subject to the binding judgments of a forum with which it has established no meaningful 'contacts, ties, or relations.'"  *Pervasive Software, Inc. v. Lexware GMBH & Co. KG*, 688 F.3d 214, 220 (2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  The Supreme Court has articulated a two-part test to determine whether a federal court sitting in diversity may properly exercise personal jurisdiction over a nonresident defendant: (1) the nonresident must have sufficient "minimum contacts" with the forum state, and (2) subjecting the nonresident to jurisdiction in the forum state must not offend traditional notions of "fair play and substantial justice."  *McFadin*, 587 F.3d at 759 (citing *Int'l Shoe*, 326 U.S. at 316).  A defendant's "minimum contacts" may give rise to either specific or general personal jurisdiction, depending on the nature of the suit and defendant's relationship to the forum state.  *Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 584 (5th Cir. 2010).  A court may assert general jurisdiction over a foreign defendant when the defendant's affiliations with the State are so "continuous and systematic" as to

4

render them essentially at home in the forum State. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851(2011) (citing *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction, on the other hand, depends on an "affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (internal quotations and citations omitted). In contrast to general jurisdiction, specific jurisdiction is confined to adjudication of "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.*

The burden of proving that the court has jurisdiction over the defendant is the plaintiff's and must be shown with regard to each claim. *Sieferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006). Generally, a plaintiff need only make a *prima facie* showing that the court has jurisdiction over the defendant. *Id.* However, when the court conducts an evidentiary hearing, as in this case, the plaintiff must demonstrate by *a preponderance of the evidence* that the court has jurisdiction over the defendant. *Irvin v. Southern Snow Mfg., Inc.*, 2013 WL 1153647 at * 1 (5th Cir. 2013) (citing *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1271 n. 12 (5th Cir. 1983)).

The law of personal jurisdiction, which stems from constitutional principles, is judge-made, and although it has evolved greatly over the past 100 years, it remains obtuse and burdened by conclusory concepts. The fundamental principles are handed down by the Supreme Court, interpreted and refined by the courts of appeal, and then applied to real cases by the district courts. The result is that tens of thousands of cases addressing personal jurisdiction are cluttered with the same phrases, derived from seminal Supreme Court decisions, and repeated like mantras. Courts routinely recite the facts of a case, and then, using the doctrinal phrases, simply pronounce that a defendant "purposefully availed itself of the privilege of conducting activities" in the forum or

"purposefully directed its activities" toward the forum. This problem of unenlightening conclusory phrases in jurisdictional case law is not new, as it was noted more than 80 years ago by Learned Hand, as he discussed the notion of a corporation's "presence" for purposes of jurisdiction: "It scarcely advances the argument to say that a corporation must be 'present' in the foreign state, if we define that word as demanding such dealings as will subject it to jurisdiction, for then it does no more than put the question to be answered.." *Hutchinson v. Chase & Gilbert, Inc.*, 45 F.2d 139, 141 (2d Cir. 1930). Judge Hand remarked that "it has become quite impossible to establish any rule from the decided cases; we must step from tuft to tuft across the morass." *Id.* at 142.

Although the Supreme Court has tried in numerous cases to bring some order to this area of the law, the morass remains. In the seminal case of *International Shoe*, the Court defended its inability to state bright line rules by invoking the fact that the inquiry was a constitutional one:

> It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.

326 U.S. at 319 (citations omitted). Even after thirty years to sort out what *International Shoe*'s "minimum contacts" test meant, the Court made little progress:

> Like any standard that requires a determination of "reasonableness," the "minimum contacts" test of *International Shoe* is not susceptible of mechanical application; rather the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present. . . . We recognize that this determination is one in which few answers will be written in black and white. The greys are dominant, and even among them the shades are innumerable.

*Kulko v. Superior Court*, 436 U.S, 84, 92 (1978). With this being the state of the law, the Court turns to the specifics of this case.

### III. GENERAL JURISDICTION

Even with the murky state of the law, the question of whether this Court has general jurisdiction over IDI is not difficult. General jurisdiction may be found when the defendant's contacts with the forum state are substantial, continuous, and systematic. *Jackson*, 615 F.3d at 584. "The continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Id.* "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction." *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (citations omitted).[4] "Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction." *Id.* at 610. It is not enough for a defendant merely to do business *with* Texas; rather, a defendant must a have a business presence *in* Texas. *Id.* "[G]eneral jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years,

---

[4]In *Johnston*, the Fifth Circuit reviewed several of its previous cases to illustrate just how difficult it is to establish general jurisdiction. *See, e.g., Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 381(5th Cir. 2003) (finding no general jurisdiction even though the defendant routinely arranged and received interline shipments to and from Texas and regularly sent sales people to Texas to develop business, negotiate contracts, and service national accounts); *Wilson v. Belin*, 20 F.3d 644, 651 (5th Cir.) ("Even if [the defendant's] contacts with Texas via his short-lived malpractice insurance arrangement through a Texas law firm and his multi-year pro bono association with the historical society were arguably continuous, we hold that they were not substantial enough to warrant the imposition of general personal jurisdiction over [him]."), *cert. denied*, 513 U.S. 930 (1994); *Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 787 (5th Cir. 1990) (holding that sporadic contacts with Louisiana were insufficient to cause the defendant to reasonably anticipate the possibility of being haled into court in Louisiana); *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 373-76 (5th Cir. 1987) (holding that the sale of over $250 million of products to seventeen Texas customers over a five year period did not constitute systematic and continuous contacts with Texas because delivery was accepted in Kansas).

up to the date the suit was filed." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 217 (5th Cir. 2000) (citations omitted). However, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 610.

IDI does not have sufficient continuous and systematic contacts with Texas to confer general jurisdiction over it in this case. IDI is a New York corporation and owns no real property outside of New York. All of IDI's directors work and live in New York and all of its bank accounts are maintained there. IDI's limited connections with Texas include having registered to do business in Texas; having one employee who currently resides in Texas for personal reasons and who works remotely from her home; having limited sales to and expenses paid to entities with Texas mailing addresses; and having hosted a conference and attended trade shows in Texas. These contacts are insufficient to subject IDI to the general jurisdiction of Texas courts.

Courts have consistently held that the appointment of an agent of process alone does not suffice to allow for the exercise of general jurisdiction. See, e.g., *Wenche Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 181–82 (5th Cir. 1992). Accordingly, the fact that IDI is registered to do business in Texas is not dispositive. In addition, the fact that IDI employs one individual who currently works remotely from her home in Texas does not show that IDI has a general business presence in Texas. *See Johnston*, 523 F.3d at 612-13 (holding that company which employed two Texas residents who worked from home was not subject to general jurisdiction in Texas). Similarly, IDI's limited sales to Texas customers—averaging less than 1% of its total sales—are not sufficient to subject it to general jurisdiction, *See Id.* 611 (finding that defendant's sales to Texas, which represented three percent of the defendant's total sales, was insufficient to give rise to general

jurisdiction).  IDI's procurement of goods and services in Texas only comprises a small percentage of its total spending—only 2.31%—and thus is insufficient to show general jurisdiction, as contracts to purchase goods or services from a Texas resident, even if entered into regularly, cannot serve as the basis for general jurisdiction.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *Johnston*, 523 F.3d at 612.  In addition, sending employees to trade shows in Texas or other minor business travel is insufficient to show general jurisdiction.  *Jackson,* 615 F.3d at 585 (attendance at two trade shows was insufficient to show general jurisdiction); *Johnston*, 523 F.3d at 613-14 ("[m]ere travel, even at regular intervals into a state, does not create general jurisdiction.").

Even considering IDI's contacts with Texas "in toto," they are not so substantial that it "should have reasonably expected to be sued in Texas on any matter, however remote from [those] contacts." *Id*. at 613 (quoting *Wilson v. Belin*, 20 F.3d 644, 650 (5th Cir. 1994)).  Based upon the foregoing, Transverse has failed to demonstrate that the Court has general jurisdiction over IDI.

### IV.  SPECIFIC JURISDICTION

It is in the area of specific jurisdiction where the work becomes more challenging.  In contrast to general jurisdiction, specific jurisdiction over a nonresident defendant exists when the plaintiff's causes of actions arise out of or result from the defendant's forum-related contacts.  *See Helicopteros*, 466 U.S. at 414 n. 8.  Specific jurisdiction requires a plaintiff to show that: (1) there are sufficient (*i.e.*, not 'random fortuitous or attenuated') pre-litigation connections between the non-resident defendant and the forum; (2) the connection has been purposefully established by the defendant; and (3) the plaintiff's cause of action arises out of or is related to the defendant's forum contacts.  *Pervasive Software, Inc.*, 688 F.3d at 221.  If the plaintiff makes this showing, the defendant can defeat the exercise of jurisdiction by showing that it would fail the fairness test, *i.e.*,

that the balance of factors show that the exercise of jurisdiction would be unreasonable. *Id*. at 221-22. Specific jurisdiction is a claim-specific inquiry and the plaintiff must establish specific jurisdiction as to each claim. *McFadin*, 587 F.3d at 759.

Transverse argues that it is appropriate to make IDI answer this suit in Texas because IDI purposefully aimed its tortious conduct at Transverse, a Texas company, with knowledge that its conduct would injure Transverse in Texas. In its argument, Transverse relies heavily on *Calder v. Jones*, 465 U.S. 783, 789 (1984). In *Calder*, the Supreme Court decided that Shirley Jones could bring suit in California against the Florida-based National Enquirer for allegedly libelous statements the Enquirer published about Jones. The Court said that jurisdiction existed over the defendants "because of their intentional conduct in Florida calculated to cause injury to respondent in California." *Id.* at 783. The Court concluded that because the defendants committed an intentional tort, knowing it would have a potentially devastating impact upon the plaintiff, and knowing that the plaintiff would be primarily injured in the state in which she lived and worked and in which the magazine had its largest circulation, the defendants "must reasonably anticipate being haled in court there to answer for the truth of the statements made in their article." *Id.* at 789 (internal citation and quotations omitted).

The Fifth Circuit has stated that a finding of jurisdiction under *Calder* based on "effects" in the forum state "is rare." *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 486 (5th Cir. 2008), *cert. denied,* 555 U.S. 816 (2008). The circuit has further clarified that the effects test "is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state," and "the key to *Calder* is that the effects of an alleged intentional tort are to be assessed

*as part* of the analysis of the defendant's relevant contacts with the forum." *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir. 1997), *cert. denied*, 522 U.S. 1048(1998).[5]

Transverse concedes that these principles are generally applicable when the plaintiff and defendant's dispute arises out of a contract. It contends, however, that the situation is different when the parties have no prior relationship, and the case arises from a tort claim. Specifically, Transverse argues:

> It is clear that in tort-based cases where the parties have no contractual relationship, a single out-of-state act which has effects in the forum state can suffice for specific jurisdiction even when the defendant has no contacts with the forum state. The act constitutes both the intentional tort and the purposeful availment or express aiming.

Plaintiff's Supplemental Brief at p. 5. Transverse relies on several cases outside of the Fifth Circuit for this argument, including the Seventh Circuit's decision in *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) ("there can be no serious doubt after *Calder*. . .that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor"), and a line of cases from the Ninth Circuit, particularly *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199 (9th Cir.), *cert. denied*, 547 U.S. 1163 (2006). The Court is not persuaded that the distinction is as clearly recognized as Transverse suggests, and regardless, it is not a distinction recognized in the Fifth Circuit.

---

[5]See also, *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 400 (5th Cir. 2009) (noting that the effects test "does not supplant the need to demonstrate minimum contacts that constitute purposeful availment, that is, conduct by the non-resident defendant that invoked the benefits and protections of the state or was otherwise purposefully directed toward a state resident"); *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002) ("At the outset we emphasize that the "effects" test is but one facet of the ordinary minimum contacts analysis, to be considered as part of the full range of the defendant's contacts with the forum").

First, while the Seventh Circuit's decision in *Janmark* might be able to be read to suggest that an out-of-state tort that causes damages to an in-state entity can, by itself, support the exercise of jurisdiction, the Seventh Circuit no longer reads it that way. The circuit noted in a 2010 decision that "*Janmark's* jurisdictional conclusion was premised on the Illinois-based injury *and* the fact that the defendant acted with the purpose of interfering with sales originating in Illinois." *Tamburo v. Dowrkin*, 601 F.3d 693, 706 (7th Cir. 2010), *cert. denied*, 131 S.Ct. 567 (2010) (emphasis in original). Thus, the court said, "despite its broad language about *Calder*, *Janmark* ultimately considered the relationship between the allegedly tortious conduct and the forum state itself." *Id.* A different panel of the Seventh Circuit reached the same conclusion several months later:

> . . .we do not read . . . *Janmark* to conflict with *Calder*, which made clear that a defendant's intentional tort creates the requisite minimum contacts with a state only when the defendant expressly aims its actions at the state with the knowledge that they would cause harm to the plaintiff there. . . . "express aiming" remains the crucial requirement when a plaintiff seeks to establish personal jurisdiction under *Calder*.

*Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assoc.'s of Houston*, 623 F.3d 440, 445-46 (7th Cir. 2010). In fact, the Ninth Circuit cases cited by Transverse require something more than an injury in the forum state, even in tort cases. *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir.), *cert. denied*, 547 U.S. 1163 (2006) ("In tort cases, we typically inquire whether a defendant 'purposefully direct[s] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendants actions were felt, whether or not the actions themselves occurred within the forum.") (citing *Calder*, 465 U.S. at 789-90).[6]

---

[6]Transverse also relies on the Tenth Circuit's decision in *Dudinikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008), and specifically on the following basketball analogy the court used to explain its rationale:

More importantly, the Fifth Circuit has not made any distinction between contract and tort cases in applying the "effects" test. Indeed, when the Court conducted a cursory, non-exhaustive review of Fifth Circuit case law, it quickly found many tort cases in which the circuit required more than a forum injury. *See Revel* 317 F.3d at 473 ("At the outset we emphasize that the "effects" test is but one facet of the ordinary minimum contacts analysis, to be considered as part of the full range of the defendant's contacts with the forum"); *Allred*, 117 F.3d at 387 ("the effects of an alleged intentional tort are to be assessed *as part* of the analysis of the defendant's relevant contacts with the forum"); *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772 (5th Cir. 1988) (under *Calder* plaintiff must show that the defendant expressly aimed its allegedly tortious activities at the forum state and that the defendant knew that the brunt of the injury would be felt there); *Stroman Realty*, 513 F.3d at 486 ("We have declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident.)[7]

---

> [I]t is something like a bank shot in basketball. A player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket. Here, defendants intended to send the [Notice of Copyright Infringement] to eBay in California, but they did so with the ultimate purpose of cancelling plaintiffs' auction in Colorado. Their "express aim" thus can be said to have reached into Colorado in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket.

*Id.* at 1075. While the Court always appreciates a good basketball analogy, it does not further Transverse's argument. As discussed, the analysis still requires a court to examine what the defendant's ultimate aim was (making a basket, or stopping an auction), and knowledge that an injury in the forum state would occur is not enough *by itself* to support jurisdiction.

[7]In *Guidry v. United States Tobacco Co., Inc.*, 188 F.3d 619, 630 (5th Cir. 1999), the Fifth Circuit applied the effects test in a case where the plaintiffs made a prima facie showing that the tobacco trade association defendants' intentional and negligent tortious actions were knowingly initiated and aimed at users and potential consumers of tobacco products in Louisiana which caused severe physical and emotional injuries. However, the Court specifically limited its application of the

13

In short, even when a plaintiff and defendant do not have a pre-existing contractual relationship, the inquiry still "focuses on whether the conduct underlying the claims was purposefully directed at the forum state." *Tamburo*, 601 F.3d at 702. "[T]he plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction under *Calder*." *Revell*, 317 F.3d at 473.[8]

All of which means that the ultimate issue here is, regardless of where Transverse suffered harm, did IDI "purposefully direct" or "expressly aim" its activities at Texas? This, in turn, causes us to return to the theme addressed earlier, regarding how to provide meaning to jurisdictional jargon like "purposefully directing" actions. Despite there being literally thousands of cases that apply the concept of "purposefully directing activities," it is difficult, if not impossible, to glean a meaningful rule from the case law to help answer the question of when activity is sufficiently "directed toward" a state to support jurisdiction. For example, the essence of the claim here is that IDI stole Transverse's trade secrets, and then used those trade secrets to oust Transverse from its software development contract with Iowa Wireless. There is little question that if IDI stole the trade secrets by physically entering Transverse's offices in Texas, and copying the data onto storage media, and subsequently used the data to interfere with Transverse's contract with Iowa Wireless, a Texas court

---

effects test in non-libel cases to "torts committed outside the forum state that cause death or serious physical harm" in the forum state, and further, the evidence in the case included advertising and other acts that took place in Louisiana. *Id.* at 623, 629.

[8]This approach appears to be the view of the majority of the federal circuit courts. *See IMO Industries, Inc. v. Kiekert AG,* 155 F.3d 254, 264-65 (3rd Cir. 1998) (stating that simply focusing on where the injury occurred "fails to accommodate *Calder's* emphasis on the fact that the forum must be the focal point of the harm and that the defendant must expressly aim the tortious activity at the forum," and noting that this view is shared by the First, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits).

could properly exercise jurisdiction over IDI.  But what if, from its New York offices, IDI hacked into Transverse's computers in Texas, stole the same data and made the same use of it?  Would that be enough activity in Texas to merit exercising jurisdiction over IDI here, even though IDI never once set foot in Texas?  From the standpoint of the "purposeful direction" doctrine, it would seem that IDI's actions were as "directed toward" Transverse in Texas in the second case as in the first.  And to go one step further, what if—as Transverse alleges in this case—IDI obtained Transverse's data from emails sent to and received from Iowa Wireless, and never touched, virtually or literally, Transverse's computers in Texas?  In all three cases, IDI has the exact same motivations—displacing Transverse from the Iowa Wireless contract through the use of Transverse's own trade secrets.  What is different is how IDI obtained the trade secrets.  Is that a distinction that makes a difference?

       The most useful guidance the undersigned has located on the precise issue here comes from Professors Wright and Miller, and what they have been able to glean from the case law.  They state that the effects test "continues to have viability, but only when the defendant's conduct both has an effect in the forum state and was directed at the forum state by the defendant."  4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.1 at p. 435 (3d ed. 2002).  From the facts presented in this case, even though IDI clearly knew that any harm from its actions would be suffered by Transverse in Texas, the undersigned cannot reasonably say that IDI's conduct was directed *at* Texas.  IDI's national sales director, who worked remotely from North Carolina, corresponded via email with IWS's employees in Iowa, to obtain the alleged trade secrets, and to solicit the software job from IWS.  Thus while the effects of this conduct were no doubt felt by Transverse in Texas, the conduct itself had at best a minimal relationship to Texas.  From the undersigned's reading of the cases, that is not enough to subject IDI to suit in Texas.

This result also comports with recent decisions of trial courts in this circuit presented with similar facts. For example, in *GlobeRanger Corp. v. Software AG*, 2013 WL 1499357 (N.D. Tex. April 12, 2013), the plaintiff alleged that the defendant had engaged in a conspiracy to steal the plaintiff's trade secrets and export them to Germany. Noting that there were no allegations that the defendant ever conducted any activities in Texas, Judge Boyle concluded that the mere fact of harm being suffered by a Texas resident was not enough to support jurisdiction over the defendant. *Id.* at *3-4.

In *Wheel-Source, Inc. v. Gullekson,* 2013 WL 944430 (N.D. Tex. March 12, 2013), a similar situation was presented. In that case, a Texas-based company brought suit against its former employee, a Michigan citizen, in Texas state court. The employee had worked for the company for several years as a salesperson from his home office in Michigan. The company alleged that it often sent defendant trade secret and confidential information from Texas via email. After the employee resigned his position and went to work for a competitor, plaintiff filed suit against him alleging that the defendant had wrongfully shared confidential information with other companies during his employment. The defendant moved to dismiss the case for lack of personal jurisdiction. Judge Lynn agreed and determined that plaintiff's allegations were insufficient to establish jurisdiction over the defendant:

> . . .Defendant's contacts with Texas relate only superficially to his general independent contractor relationship with Texas. The conduct that forms the basis of Plaintiff's Complaint appears to have occurred in Michigan where Defendant worked. Plaintiff's communications with Defendant through phone and email and from and to Texas do not establish a basis for concluding that Defendant engaged in purposeful jurisdictional conduct here. Without any allegations connecting Defendant's alleged tortious conduct to Texas, Plaintiff appears to rely on Defendant's contacts with Texas that are attenuated or fortuitous, as opposed to purposeful.

*Id.* at *6.[9]

Finally, in *Level 10 Promotions LLC v. Wilkes-Barre Motors, Inc.*, 2008 WL 2781534 (W.D. La. July 14, 2008), the Louisiana plaintiff, a company that organized and planned sales events for auto dealers, sued a Pennsylvania car dealership for conversion, unfair competition, unfair trade practices, and unjust enrichment, as well as breach of contract. In the section of the opinion focused on the plaintiff's tort claims, Judge Vance noted that the Fifth Circuit "has scaled back the effects test in recent years," and concluded that "the injury alleged here, which is purely financial, does not rise to the level of tortious conduct the Fifth Circuit intended to embrace with the effects test." *Id.* at *5-6. It distinguished *Guidry* on the basis that "the harm caused in that case was physical, rather than solely monetary," as the defendants "were not charged 'with mere untargeted negligence endangering only economic or reputational interests,' but rather with actions that would potentially have a 'devastating physically harmful impact.'" *Id*. (quoting *Guidry,* 188 F.3d at 630).[10]

The primary distinction between the above-cases which found no jurisdiction and the cases cited by Transverse which did find jurisdiction is that in those cases the defendant not only caused harm in the forum state, but also expressly aimed its actions in the forum. For example, in the *Tamburo* case, the defendants not only sent allegedly defamatory emails across the internet, but they also posted the plaintiff's address online, and encouraged others to contact the plaintiff in Illinois

---

[9]Transverse argues *Wheel-Source* is distinguishable because Judge Lynn did not mention the effects test in her decision. As already noted, the effects test does not replace the minimum contacts analysis and the plaintiff must still demonstrate that the defendant purposefully directed his conduct at the forum. Thus, the *Wheel-Source* court's holding that there was no jurisdiction in the case was based on the fact that the defendant did not engage in purposeful jurisdictional conduct in Texas.

[10]There are many other cases where similar conclusions have been reached. *See e.g., McFadin* 587 F.3d at 762 (plaintiff suing for trademark infringement cannot sue in Texas, its home state, when "the actions of selling allegedly infringing handbags are not directed toward Texas in any manner").

where he was located, and harass him and complain about his actions. *Tamburo*, 601 F.3d at 698. In *Dudinikov* the defendant not only sent an email to eBay in California, but also, by doing so, caused an auction in Colorado—the forum state—to be cancelled. The same cannot be said here. Even though IDI plainly knew that Transverse was located in Texas, and thus knew that any harm it caused Transverse would be felt there, there is no evidence that IDI attempted to make anything happen in Texas. It allegedly obtained Transverse's trade secrets from Iowa Wireless via emails sent between North Carolina, New York, and Iowa, and any communications it had with Iowa Wireless encouraging it to withdraw from its contract with Transverse took place between these same three locations. Transverse does not point to any conduct, any event, any action that IDI either itself took, or caused to occur, within Texas. None of its actions were directed toward Texas; rather, they were directed toward Iowa (though the harmful effects of those actions were felt by Transverse in Texas).

At the end of the day, Transverse has failed to show that IDI purposefully directed any activity toward Texas in this case. The alleged tortious conduct in this case relates to New York-based IDI's relationship with Iowa-based IWS. All of the alleged acts that give rise to the claims in this lawsuit took place in New York, North Carolina, and Iowa, not Texas.

Because Transverse has failed to meet the first prong of the specific jurisdiction inquiry, the Court need not examine whether exercising specific jurisdiction over IDI comports with fair play and substantial justice. *See Panda Brandywine*, 253 F.3d at 870. Further, given that the Court has examined the strongest claims for the exercise of jurisdiction over IDI (theft of trade secrets, conversion, and tortious interference with contract), and found those arguments lacking, there is no need to extend the analysis by going through the same exercise on weaker claims. Given that there

are not adequate contacts between IDI and Texas to maintain jurisdiction over it on these claims, there is plainly no jurisdiction on the claims of unjust enrichment or unfair competition.

## V.  RECOMMENDATION

For the reasons set forth above, the undersigned magistrate judge **RECOMMENDS** that the District Court **GRANT** Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. # 5). The Magistrate Court **FURTHER RECOMMENDS** that the District Court **DISMISS** this action without prejudice to being refiled in a court with jurisdiction over the parties, and **DENY** all relief not expressly granted in its order.  Finally, the Court **RECOMMENDS** that the Defendant's Alternative Motion to Transfer is **DENIED** as **MOOT**.

## VI.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 17th day of June, 2013.

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE